Edward J. Wynne (SBN 165819)
ewynne@wynnelawfirm.com
George Nemiroff (SBN 262058)
gnemiroff@wynnelawfirm.com
WYNNE LAW FIRM
80 E. Sir Francis Drake Blvd., Ste. 3G
Larkspur, CA 94939
Telephone   (415) 461-6400
Facsimile   (415) 461-3900

Logan A. Pardell* (admitted *pro hac vice*)
lpardell@pkglegal.com
PARDELL, KRUZYK & GIRIBALDO, PLLC
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Telephone (561) 447-8444
Facsimile (877) 453-8003

*Counsel for Plaintiffs and the Putative Collective*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mark Sablowsky and Sumner Johnson, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>vs.<br><br>Auto-Chlor System, LLC, Auto-Chlor System of New York City, Inc., and Auto-Chlor System of the Mid South, LLC<br><br>Defendants. | Case No. 3:23-cv-02555-AGT<br><br>**DECLARATION OF MARK SABLOWKY IN SUPPORT OF PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION** |

Declaration of Mark Sablowsky - 3:23-cv-02555-AGT - 1

I, Mark Sablowsky, declare under penalty of perjury as follows:

1. I am over 18 years old.

**Employment History**

2. I was employed as a Branch Manager ("BM") by Auto-Chlor System, LLC and Auto-Chlor of New York City, Inc. (collectively, "Auto-Chlor") from approximately November 2020 through November 2021 at an Auto-Chlor branch in Levittown, Pennsylvania.

3. As a BM, I was classified as a salaried employee and did not receive overtime compensation for any hours I worked over 40 in a week.

**Hours Worked**

4. As a BM, due to the demands of the job, I typically was required to work much more than 40 hours in a week. I generally began working each workday between 7:00 a.m. and 8:00 a.m. because my Regional Manager, Michael Devers, required that I arrive before any of the hourly staff to be prepared to participate in a daily recap, collect paperwork, and load trucks. Mr. Devers likely knew I arrived this early because I did so at his direction and because, on occasion, I would speak with him first thing in the morning.

5. I ended my workday anywhere between 4:00 p.m. and 8:00 p.m. because Mr. Devers required that I be present at the time that the last route driver completed his or her route. Mr. Devers communicated the mandate for me to be present when the last route driver came back to the branch and therefore was likely aware of when I left the branch.

6. In addition, nearly every workday I was unable to take a meal break in which I was completely relieved of duty for 20 minutes or more. This is because, due to my packed schedule running route, I would eat on the road almost every day.

7. In addition, I worked several hours per week from home to respond to calls and emails from customers and Mr. Devers and to complete miscellaneous paperwork.

8. Also, I was required to work "on call" approximately 14 days per month. When working on call, I was expected to respond to any calls or emergencies immediately or, if late at night, the following morning. I was unable to be anywhere other than my home

or the branch and I was unable to consume alcohol on those days. I was expected to be available for nearly all 24 hours of the days on which I was on call. While the Route Drivers were also required to be on call, I was on call more often because I believe the Route Drivers received overtime pay if they were on call and I did not and therefore it was much cheaper for me to be on call than a Route Drivers.

9. Thus, I estimate that I worked, on average, a total of approximately 50 hours, or more, per week, as a BM. On the weeks in which I was on call, I worked even more than this estimate. I believe Auto-Chlor knew about the long overtime hours I worked because I discussed the long hours I worked both over the phone with Mr. Devers, and at quarterly meetings with Auto-Chlor System, LLC's Chief Operating Officer, Kevin McCurdy; Chief Executive Officer, Ed Ivy; Regional Vice President, JP Fiorentini; Mr. Devers; and other BMs in the region.

**Job Duties**

10. As a BM, a vast majority of my time was spent doing manual work and customer service job duties such as: servicing, installing, and/or rebuilding dishwashers, visiting with clients to collect payment and drop off supplies, counting inventory, and loading and unloading trucks. These are the same tasks that hourly paid Route Drivers were expected to perform. There were almost no tasks that I did that were not also performed by hourly employees. These duties were the most important part of my job as a BM.

11. The reason so much of my job was in the field servicing dishwashers is because my branch was short-staffed. Auto-Chlor requires that all clients be visited once every four weeks to collect payment, to check the dishwasher, and to deliver supplies. I recall that I serviced approximately 75 to 80 customers at any one time. As such, nearly all of my day was spent visiting these customers, and not performing management or sales-related functions.

12. Although I held the BM title, I did not have authority to manage the branch. My assignments were provided by corporate and Mr. Devers. I could not change corporate policy, set the prices, set the dress code, set the rate of pay for hourly employees, or decide

what products to sell.

13. To the extent I performed any "managerial" job functions, it was rare and my involvement in such functions was minimal. For example, while I may have occasionally sat in on an interview with Mr. Devers, I did not make the hiring decision. In fact, Mr. Devers often did not even ask my opinion of the candidate and, if he did, he often disagreed with my opinion and did the opposite. For example, I specifically recall that I told him that I wanted to hire a salesperson and a route driver that we interviewed together, but he chose not to do so.

14. Similarly, with regards to discipline or termination, I could not make these decisions. I recall that I wanted to discipline an employee who had failed to report to work for several days in a short period of time, and Mr. Devers did not allow me to write that employee up. Thus, I did not have the authority to make the final decision to hire promote, discipline, or fire employees.

15. I had no input into corporate policies or what the labor budget should be. I had no influence on the corporate directives that controlled my job. As a BM, all of my work was assigned to me through corporate directives or the Regional Manager. These directives controlled what tasks I worked on and how I performed those tasks

**Auto-Chlor System, LLC**

16. It is my understanding that Auto-Chlor System, LLC, was one of my employers.

17. While my paycheck reflected "Auto-Chlor System of New York City, Inc.," and this was the entity that was listed on contracts with customers, I do not recall any other mention of this specific entity at any other time during my employment with Auto-Chlor.

18. My offer letter reflected "Auto-Chlor System." My business card reflected "Auto-Chlor System." My email address was "sablowsky@autochlor.com." It is my belief that employees at corporate and employees at other branches used similar domain names (@autochlor.com) for their email addresses.

19. The employment handbook was for "Auto-Chlor System," which I believe

Declaration of Mark Sablowsky - 3:23-cv-02555-AGT - 4

was created at Auto-Chlor System, LLC's corporate office in Mountain View, California, and is the same employee handbook applicable to all Auto-Chlor branches throughout the country. This employee handbook includes policies and procedures that control the way all employees at Auto-Chlor branches across the country are to perform their jobs.

20. The vehicles other technicians and I drove had the "Auto-Chlor System" logo on them. It is my understanding that all Auto-Chlor vehicles across the country have the same logo.

21. All communications related to human resources run through Auto-Chlor System, LLC's main office in Mountain View, California. For example, when I had to report issues regarding COVID-related absences, I spoke directly with Auto-Chlor System, LLC's human resources department. It is my understanding that this human resources department is involved and ultimately makes the termination decisions. I believe they were also involved in hiring as new prospective employees apply via Auto-Chlor's website. It is also my understanding that Auto-Chlor System, LLC generally controlled the conditions of my employment as well as all other BMs across the country and had the ability to hire and fire us if they chose to do so. Further, I believe all employee records are maintained and controlled by the human resources department at the corporate office for Auto-Chlor System, LLC.

**Other BMs Like Me**

22. To my knowledge, Auto-Chlor paid all of its BMs the same way—meaning it classified all BMs, including myself, as exempt from overtime pay. While I do not recall discussing pay with specifically with other BMs, based on my understanding of the uniform nature of the job and the similar complaints during quarterly meetings I heard from other BMs, such as Jeff Brown (Foxboro, Massachusetts), Dan Vindheim (Bethel, Connecticut), and Mel Sim (Queens, New York), I believe they similarly were paid a salary and no overtime for overtime hours worked.

23. To my knowledge, all BMs, including Jeff Brown (Foxboro, Massachusetts), Dan Vindheim (Bethel, Connecticut), and Mel Sim (Queens, New York), primarily

performed the same manual labor and customer service job functions as I performed. I believe this to be true because, during quarterly meetings, we discussed the fact that each of our branches were short staffed, requiring us to spend most of or workdays running route.

24. Like me, other BMs such as Jeff Brown (Foxboro, Massachusetts), Dan Vindheim (Bethel, Connecticut), and Mel Sim (Queens, New York), regularly worked more than 40 hours per week. I believe this to be true because we discussed the long hours we were working during these quarterly meetings.

25. I believe that if BMs were made aware of their right to receive overtime pay and were provided assurances by the Court that Auto-Chlor and other employers could not retaliate against them for seeking their unpaid overtime wages from Auto-Chlor, other BMs, such as Mel Sim (Queens, New York), would likely come forward with claims for overtime compensation due. I believe this to be true because he also complained about the long hours he was working and how he spent much of his day running route. Like me, these other BMs worked the same long hours I did and I anticipate would similarly want to recover any unpaid overtime due to them.

26. At no time do I recall that Auto-Chlor surveyed or studied the duties or work of myself or other BMs individually to determine whether the duties, work, or the position should have entitled BMs to overtime pay.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Mark Sablowsky (Aug 3, 2023 12:39 EDT)

MARK SABLOWSKY