1 | Edward J. Wynne (SBN 165819)
ewynne@wynnelawfirm.com
George Nemiroff (SBN 262058)
gnemiroff@wynnelawfirm.com
WYNNE LAW FIRM
80 E. Sir Francis Drake Blvd., Ste. 3G
Larkspur, CA 94939
Telephone   (415) 461-6400
Facsimile    (415) 461-3900

Logan A. Pardell* (admitted *pro hac vice*)
lpardell@pkglegal.com
PARDELL, KRUZYK & GIRIBALDO, PLLC
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Telephone (561) 447-8444
Facsimile (877) 453-8003

*Counsel for Plaintiffs and the Putative Collective*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mark Sablowsky and Sumner Johnson, *on behalf of themselves and others similarly situated*,<br><br>　　　　　　　Plaintiffs,<br><br>　vs.<br><br>Auto-Chlor System, LLC, Auto-Chlor System of New York City, Inc., and Auto-Chlor System of the Mid South, LLC<br><br>　　　　　　　Defendants. | Case No. 3:23-cv-02555-AGT<br><br>**DECLARATION OF JEFF BROWN IN SUPPORT OF PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION** |

Declaration of Jeff Brown - 3:23-cv-02555-AGT - 1

I, Jeff Brown, declare under penalty of perjury as follows:

1. I am over 18 years old.

**Employment History**

2. I was employed as a Branch Manager ("BM") by Auto-Chlor System, LLC and Auto-Chlor of New York City, Inc. (collectively, "Auto-Chlor") from approximately September 2017 through October 2021 at an Auto-Chlor branch in Foxboro, Massachusetts.

3. As a BM, I was classified as a salaried employee and did not receive overtime compensation for any hours I worked over 40 in a week.

**Hours Worked**

4. During my interview process, my Regional Vice President at the time, Anthony Cioffi, told me that the expectation was to work approximately 45 hours as a BM. However, due to the demands of the BM position, I typically was required to work much more than that. I generally began working each day between approximately 7:00 a.m. and 7:30 a.m. because I had administrative paperwork to complete and because we typically had a branch meeting every day at 7:30 a.m. Auto-Chlor knew I worked this early because Mr. Fiorentini told me to come in this early and would, on occasion, physically be in the branch at the time the branch meeting took place.

5. I would often end my workday anywhere between 6:00 p.m. and 7:00 p.m., if not later, depending on the time I finished running route or conducting installations. However, there were occasions when I would not be done working until after 9:00 p.m. Auto-Chlor knew how late I was working because I spoke with Regional Manager, JP Fiorentini, about my routes and the number of hours I was working.

6. Further, I do not recall when I was able to ever take a meal break in which I was completely relieved of duty for 20 minutes or more. This is because, due to my packed schedule running routes, I would eat while on the road almost every day.

7. In addition, I worked varying additional hours per week from home to perform additional tasks such as completing paperwork and answering emails.

8. Also, I was required to work "on call" as a BM with Auto-Chlor. While at the end of my employment I worked on call between three and seven days per month, at the beginning of my employment I worked between 15 and 20 on-call days per month, in part due to staffing issues. When working on call, I was expected to respond to any calls or emergencies immediately or, if late at night, the following morning. I was unable to be anywhere other than my home or the branch and I was unable to consume alcohol on those days. I was expected to be available for nearly all 24 hours of the days on which I was on call. While Route Drivers were also required to be on call, I was on call more often because I believe Route Drivers received overtime pay if they were on call, and I did not. Therefore, I believe it was much cheaper for Auto-Chlor to have me be on call than Route Drivers.

9. I estimate that I worked a total of approximately 55 to 65 hours, per week, as a BM. On the weeks in which I was on call, I estimate I worked significantly more hours. Auto-Chlor knew that I was working significant overtime hours because I frequently complained to Mr. Fiorentini about the number of hours I was working.

**Job Duties**

10. As a BM, I spent a large portion of my workday doing manual work and customer service job duties such as: servicing dishwashers, installing dishwashers, rebuilding dishwashers, visiting with clients to collect payment and deliver chemicals, counting inventory, and loading and unloading trucks trucks. These are the same tasks that hourly paid Route Drivers were expected to perform. There were almost no tasks that I did that were not also performed by hourly paid employees. These duties were the most important part of my job as a BM.

11. The reason so much of my job was in the field servicing dishwashers is because my branch was short-staffed. Auto-Chlor required that all clients be visited once every four weeks to collect payment, to check the dishwasher, and to deliver supplies. I recall that I serviced approximately 80 to 100 customers at any one time. As such, a large portion of my day was spent visiting these customers, and not performing

1 management or sales-related functions.

2     12.    Although I held the BM title, I did not have authority to manage the
3 branch. My assignments were provided by corporate and my Regional Manager, JP
4 Fiorentini. I could not change corporate policy, set the prices, set the dress code, set the
5 rate of pay for hourly employees, or decide what products to sell.

6     13.    To the extent I performed any "managerial" job functions, it was rare and
7 my involvement in such functions was minimal. For example, while I may have
8 occasionally conducted an initial interview after the candidate was previously screened
9 by an Auto-Chlor System recruiter, I merely took information and passed it along to
10 the Regional Vice President, JP Fiorentini, who would conduct the final interview and
11 make the hiring decision. I did not make these hiring decisions and Mr. Fiorentini did
12 not consider my input when making the hiring decision. I know this because in the times
13 that he did ask for my opinion on a candidate, he often disagreed and did the opposite
14 of what I suggested.

15     14.    Similarly, with regards to termination, Auto-Chlor expected me to relay
16 information to Mr. Fiorentini and human resources so that they could make the decision
17 on whether to terminate an employee. I did not make these decisions. In addition, I did
18 not have authority to promote employees or to independently formally discipline
19 employees.

20     15.    I had also no input into corporate policies or what the labor budget should
21 be. I had no influence on the corporate directives that controlled my job. As a BM, all
22 of my work was assigned to me through corporate directives or the Regional Manager.
23 These directives controlled what tasks I worked on and how I performed those tasks.

24 **Auto-Chlor System, LLC**

25     16.    It is my understanding that Auto-Chlor System, LLC, was one of my
26 employers.

27     17.    While my paycheck reflected "Auto-Chlor System of New York City,
28 Inc.," and I recall that our clients signed contracts with Auto-Chlor System of New

City, Inc., for their dishwashers, I do not recall any other mention of this specific entity at any other time during my employment with Auto-Chlor, other than a couple of miscellaneous forms.

18. My offer letter reflected "Auto-Chlor System." My business card reflected "Auto-Chlor System." My email address was jbrown@autochlor.com. I believe that employees at corporate and employees at other branches used similar domain names (@autochlor.com) for their email addresses.

19. The employment handbook was for "Auto-Chlor System," which I believe was created at Auto-Chlor System, LLC's corporate office in Mountain View, California, and I believe would be the same employee handbook applicable to all Auto-Chlor branches throughout the country. This employee handbook includes policies and procedures that I believe control the way all employees at Auto-Chlor branches across the country are to perform their jobs. I believe this because I recall that the corporate human resources department communicated with our branch regarding the company's timekeeping policies and procedures.

20. The vehicles other Route Drivers and I drove had the "Auto-Chlor System" logo on them. It is my understanding that all Auto-Chlor vehicles across the country have the same logo.

21. All communications related to human resources run through Auto-Chlor System, LLC's main office in Mountain View, California. For example, new prospective employees apply via Auto-Chlor's website. It is my understanding that Auto-Chlor System, LLC controlled the conditions of my employment as well as all other BMs across the country and had the ability to hire and fire us if they chose to do so. I believe this to be true because communications regarding terminations had to go through human resources for approval. It is also my understanding that all employee records are maintained and controlled by the human resources department at the corporate office for Auto-Chlor System, LLC.

Declaration of Jeff Brown - 3:23-cv-02555-AGT - 5

**Other BMs Like Me**

22. To my knowledge, Auto-Chlor paid all of its BMs the same way—meaning it classified all BMs, including myself, as exempt from overtime pay. I know this because, either at regional meetings or over the phone, I spoke with other BMs including, Mark Brantner (Carlstadt, NJ), Ronald Lacy (Long Island, NY), Mel Sim (Queens, NY), Daniel Vindheim (Bethel, Connecticut), Mark Sablowsky (Newton, Pennsylvania) regarding the fact that we worked significant overtime hours, but did not receive overtime pay.

23. To my knowledge, all BMs, including Mark Brantner (Carlstadt, NJ), Ronald Lacy (Long Island, NY), Mel Sim (Queens, NY), Daniel Vindheim (Bethel, Connecticut), Mark Sablowsky (Newton, Pennsylvania), primarily performed the same manual labor and customer service job functions as I performed. I believe this to be true because I spoke with them both in-person and over the phone about the fact that running route due to short-staffing was the most important and time-consuming aspect of our jobs.

24. Like me, other BMs, regularly worked more than 40 hours per week. I believe this to be true because I spoke with other BMs, such as Mark Brantner (Carlstadt, NJ), Ronald Lacy (Long Island, NY), Mel Sim (Queens, NY), Daniel Vindheim (Bethel, Connecticut), and Mark Sablowsky (Newton, Pennsylvania), both in person during regional meetings and over the phone about the fact that we worked significant overtime hours.

25. I believe that if BMs were made aware of their right to receive overtime pay, and were provided assurances by the Court that Auto-Chlor and other employers could not retaliate against them for seeking their unpaid overtime wages from Auto-Chlor, other BMs, such as Mark Brantner (Carlstadt, NJ), Ronald Lacy (Long Island, NY), and Mel Sim (Queens, NY), would likely come forward with claims for overtime compensation due. I believe this to be true because we all complained about how many hours we were working running routes without being paid overtime. Like me, these

1  other BMs worked the same long hours I did and I anticipate they would similarly want
2  to recover any unpaid overtime due to them.
3       26.   At no time do I recall that Auto-Chlor surveyed or studied the duties or
4  work of myself or other BMs individually to determine whether the duties, work, or the
5  position should have entitled BMs to overtime pay.
6       I declare under penalty of perjury that the foregoing is true and correct to the
7  best of my knowledge and belief.


Jeffrey Brown (Aug 2, 2023 16:06 EDT)

JEFF BROWN

Declaration of Jeff Brown - 3:23-cv-02555-AGT - 7