Edward J. Wynne (SBN 165819)
ewynne@wynnelawfirm.com
George Nemiroff (SBN 262058)
gnemiroff@wynnelawfirm.com
WYNNE LAW FIRM
80 E. Sir Francis Drake Blvd., Ste. 3G
Larkspur, CA 94939
Telephone   (415) 461-6400
Facsimile    (415) 461-3900

Logan A. Pardell* (admitted *pro hac vice*)
lpardell@pkglegal.com
PARDELL, KRUZYK & GIRIBALDO, PLLC
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Telephone (561) 447-8444
Facsimile (877) 453-8003

*Counsel for Plaintiffs and the Putative Collective*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mark Sablowsky and Sumner Johnson, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>vs.<br><br>Auto-Chlor System, LLC, Auto-Chlor System of New York City, Inc., and Auto-Chlor System of the Mid South, LLC<br><br>Defendants. | Case No. 3:23-cv-02555-AGT<br><br>**DECLARATION OF DANIEL VINDHEIM IN SUPPORT OF PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION** |

Declaration of Daniel Vindheim - 3:23-cv-02555-AGT - 1

I, Daniel Vindheim, declare under penalty of perjury as follows:

1. I am over 18 years old.

**Employment History**

2. I was employed as a Branch Manager ("BM") by Auto-Chlor System, LLC and Auto-Chlor of New York City, Inc. (collectively, "Auto-Chlor") from approximately August 2020 through April 2022 at an Auto-Chlor branch in Bethel, Connecticut.

3. As a BM, I was classified as a salaried employee and did not receive overtime compensation for any hours I worked over 40 in a week.

**Hours Worked**

4. During my interview process, my Regional Vice President, JP Fiorentini, told me that the expectation was to work approximately 45 hours as a BM. However, due to the demands of the BM position, I typically was required to work much more than that. Each day, I generally began working between approximately 7:00 a.m. and 7:30 a.m. because we typically had a branch meeting every day at 7:30 a.m. Auto-Chlor knew I worked this early because Mr. Fiorentini told me to come in this early and would often physically be in the branch at the time the branch meeting took place. I would often end my workday between 6:00 p.m. and 7:00 p.m., depending on the time I finished running route or conducting installations. However, there were occasions when I would not be done working until after 8:00 p.m. Auto-Chlor knew how late I was working because Mr. Fiorentini was often still in the branch at the time I came back from running routes.

5. In addition, nearly every day I worked I was unable to take a meal break in which I was completely relieved of duty for 20 minutes or more. This is because, due to my packed schedule running route, I would eat while on the road almost every day.

6. In addition, I worked approximately two to four hours per week from home to perform miscellaneous projects that Mr. Fiorentini assigned me to complete.

7. Also, I was required to work "on call" anywhere between 4 and 15 days

per month. This is because, as I continued to work for Auto-Chlor, we became increasingly short-staffed and the amount of time I spent on call similarly increased. When working on call, I was expected to respond to any calls or emergencies immediately or, if late at night, the following morning. I was unable to be anywhere other than my home or the branch and I was unable to consume alcohol on those days. I was expected to be available for nearly all 24 hours of the days on which I was on call. While Route Drivers were also required to be on call, I was on call more often because I believe Route Drivers received overtime pay if they were on call and I did not. Because of that, it was much cheaper for me to be on call than Route Drivers.

8. I estimate that I worked, on average, a total of approximately 55 to 65 hours, per week, as a BM. On the weeks in which I was on call, I worked even more than that estimate. Auto-Chlor knew that I was working significant overtime hours because I frequently complained to Mr. Fiorentini about the number of overtime hours I was working.

**Job Duties**

9. As a BM, nearly all of my time was spent doing manual work and customer service job duties such as: servicing, installing, and/or rebuilding dishwashers, visiting with clients to collect payment and drop off supplies, counting inventory, and loading and unloading trucks. These are the same tasks that hourly paid Route Drivers were expected to perform. There were almost no tasks that I did that were not also performed by hourly employees. These duties were the most important part of my job as a BM.

10. The reason so much of my job was in the field servicing dishwashers is because my branch was short-staffed. Auto-Chlor required that all clients be visited once every four weeks to collect payment, to check the dishwasher, and to deliver supplies. I recall that I serviced approximately 150 customers at any one time. As such, nearly all of my day was spent visiting these customers, and not performing management or sales-related functions.

Declaration of Daniel Vindheim - 3:23-cv-02555-AGT - 3

11. Although I held the BM title, I did not have authority to manage the branch. My assignments were provided to me by corporate and Mr. Fiorentini. I could not change corporate policy, set the prices, set the dress code, set the rate of pay for hourly employees, or decide what products to sell.

12. To the extent I performed any "managerial" job functions, it was rare and my involvement in such functions was minimal. For example, while I may have occasionally conducted an initial interview after the candidate was previously screened by an Auto-Chlor System recruiter, I merely took information and passed it along to the Regional Vice President, JP Fiorentini, who would conduct the final interview and make the hiring decision. I did not make these hiring decisions and Mr. Fiorentini did not consider my input when making the hiring decision. I know this because in the times that he did ask for my opinion on a candidate, he often disagreed and did the opposite of what I suggested. Specifically, in approximately 2021, the route supervisor at my branch quit and I asked Mr. Fiorentini whether we could hire a replacement route supervisor. Mr. Fiorentini declined due to profitability concerns and inferred that I should take on route supervisor responsibilities. Thus, I did not have the authority to make the final decision to hire or fire employees as Mr. Fiorentini made these decisions without seeking or strongly considering my input.

13. I did not have authority to promote employees or to independently formally discipline employees. If there was a violation of company policy or an employee wanted a raise, I merely passed this information along to Mr. Fiorentini who decided how to handle the situation. For example, I recall there was an employee who had a dress code issue and when I relayed that information to Mr. Fiorentini, he handled the disciplinary action himself. As another example, when I passed along information that an employee wanted a raise and even though I may have thought the employee deserved the raise, Mr. Fiorentini would decline to give the requested raises.

14. Similarly, I had no input into corporate policies or what the labor budget should be. I had no influence on the corporate directives that controlled my job. As a

1  BM, all of my work was assigned to me through corporate directives or Mr. Fiorentini.
2  These directives controlled what tasks I worked on and how I performed those tasks.
3  **Auto-Chlor System, LLC**
4  15.  It is my understanding that Auto-Chlor System, LLC, was one of my
5  employers.
6  16.  While my paycheck reflected "Auto-Chlor System of New York City,
7  Inc." I do not recall any other mention of this specific entity at any other time during
8  my employment with Auto-Chlor other than contracting with customers.
9  17.  My offer letter reflected "Auto-Chlor System." My business card
10 reflected "Auto-Chlor System." My email address was "vindheim@autochlor.com." I
11 recall that employees at corporate and employees at other branches used similar domain
12 names (@autochlor.com) for their email addresses.
13 18.  The employment handbook was for "Auto-Chlor System," which I
14 believe was created at Auto-Chlor System, LLC's corporate office in Mountain View,
15 California, and is the same employee handbook applicable to all Auto-Chlor branches
16 throughout the country.  I believe this to be true because I would be on conference calls
17 with Auto-Chlor System, LLC's Chief Operating Officer, Kevin McCurdy, as well as
18 multiple other BMs from across the country to go over Auto-Chlor's common policies
19 and procedures. In addition, I recall that many of the employment policies were national
20 and reflected California standards, which makes me believe that the policies were
21 created in California. This employee handbook includes policies and procedures that
22 control the way all employees at Auto-Chlor branches across the country are to perform
23 their jobs.
24 19.  The vehicles other Route Drivers and I drove had the "Auto-Chlor
25 System" logo on them. It is my understanding that all Auto-Chlor vehicles across the
26 country have the same logo.
27 20.  All communications related to human resources run through Auto-Chlor
28 System, LLC's main office in Mountain View, California. For example, new

Declaration of Daniel Vindheim - 3:23-cv-02555-AGT - 5

prospective employees apply via Auto-Chlor's website. Potential applicants were sent to our branch by Auto-Chlor System, LLC's regional recruiters. It is my understanding that Auto-Chlor System, LLC controlled the conditions of my employment as well as all other BMs' employment across the country and had the ability to hire and fire us if they chose to do so. I believe this to be true because the Chief Executive Officer, Ed Ivy, the Safety and Fleet Operations Manager, Nick Eddy, and the COO of Auto-Chlor System, LLC, would visit my branch to advise exactly how they expected the branch to run.

21. It is also my understanding that all employee records are maintained and controlled by the human resources department at the corporate office for Auto-Chlor System, LLC.

**Other BMs Like Me**

22. To my knowledge, Auto-Chlor paid all of its BMs the same way—meaning it classified all BMs, including myself, as exempt from overtime pay. I know this because I spoke with other BMs, including Jeff Brown (Foxboro, Massachusetts), Mark Sablowsky (Newton, Pennsylvania), Victor Chew (Albany, New York), Jose Perez Ramos (Bronx, New York), Ron Lacy (Long Island, New York) and Mel Sim (Queens, New York), either over the phone or in person during quarterly meetings or when visiting each other's branches and we complained about the fact that we were working significant overtime hours without receiving overtime compensation.

23. To my knowledge, all BMs, including Jeff Brown (Foxboro, Massachusetts), Mark Sablowsky (Newton, Pennsylvania), Victor Chew (Albany, New York), Jose Perez Ramos (Bronx, New York), Ron Lacy (Long Island, New York) and Mel Sim (Queens, New York), primarily performed the same manual labor and customer service job functions as I performed. I believe this to be true because we discussed our job duties and how we were short-staffed while we were on the phone or in person during quarterly meetings or when visiting each other's branches.

24. Like me, other BMs such as Jeff Brown (Foxboro, Massachusetts), Mark

Sablowsky (Newton, Pennsylvania), Victor Chew (Albany, New York), Jose Perez Ramos (Bronx, New York), Ron Lacy (Long Island, New York) and Mel Sim (Queens, New York), regularly worked more than 40 hours per week. I believe this to be true because based on the discussions that I had with these individuals either over the phone or in person.

25. I believe that if BMs were made aware of their right to receive overtime pay, and were provided assurances by the Court that Auto-Chlor and other employers could not retaliate against them for seeking their unpaid overtime wages from Auto-Chlor, other BMs, such as Victor Chew (Albany, New York), Jose Perez Ramos (Bronx, New York), Ron Lacy (Long Island, New York) and Mel Sim (Queens, New York), would likely come forward with claims for overtime compensation due. I believe this to be true because we all complained about the hours we worked and the fact that we did not receive overtime pay. Like me, these other BMs worked the same long hours I did and I anticipate would similarly want to recover any unpaid overtime due to them.

26. At no time do I recall that Auto-Chlor surveyed or studied the duties or work of myself or other BMs individually to determine whether the duties, work, or the position should have entitled BMs to overtime pay.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Daniel Vindheim (Aug 3, 2023 19:33 EDT)
Daniel Vindheim