Edward J. Wynne (SBN 165819)
ewynne@wynnelawfirm.com
George Nemiroff (SBN 262058)
gnemiroff@wynnelawfirm.com
WYNNE LAW FIRM
80 E. Sir Francis Drake Blvd., Ste. 3G
Larkspur, CA 94939
Telephone   (415) 461-6400
Facsimile    (415) 461-3900

Logan A. Pardell* (admitted *pro hac vice*)
lpardell@pkglegal.com
PARDELL, KRUZYK & GIRIBALDO, PLLC
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Telephone (561) 447-8444
Facsimile (877) 453-8003

*Counsel for Plaintiffs and the Putative Collective*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mark Sablowsky and Sumner Johnson, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>vs.<br><br>Auto-Chlor System, LLC, Auto-Chlor System of New York City, Inc., and Auto-Chlor System of the Mid South, LLC<br><br>Defendants. | Case No. 3:23-cv-02555-AGT<br><br>**DECLARATION OF SUMNER JOHNSON IN SUPPORT OF PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION** |

Declaration of Sumner Johnson - 3:23-cv-02555-AGT - 1

I, Sumner Johnson, declare under penalty of perjury as follows:

1. I am over 18 years old.

**Employment History**

2. I was employed as a Branch Manager ("BM") by Auto-Chlor System, LLC and Auto-Chlor of the Mid-South, LLC (collectively, "Auto-Chlor") from approximately 2018 through February 2021 at an Auto-Chlor branch in Newton, Iowa.

3. As a BM, I was classified as a salaried employee and did not receive overtime compensation for any hours I worked over 40 in a week.

**Hours Worked**

4. When I interviewed for the BM position, I was told by my Regional Manager, Ryan Hodel, that the expectation would be that I would work from approximately 8:00 a.m. to 5:00 p.m. with a 30-minute meal break.

5. However, due to the demands of the job, I frequently had to work much more than that. My branch had customers throughout nearly the entire state of Iowa. As such, depending on the location of the first customer I would service, I had to arrive to the branch anywhere between 6:00 a.m. and 7:45 a.m. to pick up and load the company vehicle. Given how far away most customers were, it was more likely that I would arrive closer to 6:00 a.m. than 7:45 a.m. Auto-Chlor knew how early I would start work because Mr. Hodel would call me most mornings to check in on me and also had access to my route schedule and therefore likely knew how far I would drive to get to my customer.

6. Given the number of customers I had to visit and how far away they were, I ended the day often between 5:00 p.m. and 7:00 p.m., and sometimes as late as 8:00 p.m. or 9:00 p.m. Auto-Chlor knew how late I would end my workday because I told Mr. Hodel during afternoon calls what time I expected to be back to the branch.

7. In addition, I was rarely, if ever, able to take a meal break in which I was completely relieved of duty for 20 minutes or more. This is because, due to my packed schedule running route, I would eat on the road almost every day.

8. In addition, I worked approximately multiple hours per week from home to

complete miscellaneous paperwork Auto-Chor required that I complete.

9. Also, I was required to work "on call" nearly every day of my employment as a BM. This is because, other than a period of approximately seven months in 2019, I was the only employee at my branch. When working on call, I was expected to respond to any calls or emergencies either immediately or, if late at night, the following morning. I was required to either be at home or at the branch while on call and I was not permitted to drink alcohol while on call. I was expected to be available for nearly all 24 hours of the days on which I was on call. I believe that Auto-Chlor chose to not hire other employees and instead required that I be on call nearly my entire employment because, if they hired a full-time route driver, they would be required to pay that person overtime and, because Auto-Chlor did not pay me overtime. Therefore, I believe it was much cheaper for me to be on call than for a new hire to be.

10. Thus, I estimate that I worked a total of, on average, approximately 50 to 65 hours, if not more, per week, as a BM. When including time that I was on call, I estimate I worked over significantly more hours per week than that. Based on the route schedules and my conversations with Mr. Hodel, I believe Auto-Chlor knew how many hours I worked as a BM.

**Job Duties**

11. As a BM, most of my workday was spent doing manual work and customer service job duties such as: servicing, installing, and/or rebuilding dishwashers, visiting with clients to collect payment and deliver supplies, counting inventory, and loading and unloading trucks. These are the same tasks that hourly paid route drivers were expected to perform. There were almost no tasks that I did that were not also performed by hourly paid employees. These duties were the most important part of my job as a BM.

12. The reason so much of my job was in the field servicing dishwashers is because my branch was short-staffed. The branch at which I worked only had one other employee who was a Sales and Service Representative, but he only worked for Auto-Chlor for approximately seven months. Other than him, there were no other employees at my

branch. Auto-Chlor required that all clients be visited once every four weeks to collect payment, to check the dishwasher, and to deliver supplies. I recall that I had to service approximately 160 customers throughout the state of Iowa. As such, nearly all of my day was spent visiting these customers in order to service dishwashers, and not performing management or sales-related functions.

13. Although I held the BM title, I did not have authority to manage the branch. My assignments were provided by corporate and my Regional Manager, Ryan Hodel. I could not change corporate policy, set the prices, set the dress code, set the rate of pay for hourly employees, or decide what products to sell.

14. To the extent I performed any "managerial" job functions, it was rare and my involvement in such functions was minimal. During the time period at issue in this lawsuit, there were no other employees at my branch and so I did not manage anyone during this time. Even after that one Sales and Service Manager left, I specifically asked Mr. Hodel to hire another route driver, but he refused to allow it and expected me to do all of the hourly work for the branch. Thus, I did not have the authority to make the final decision to hire or fire employees and Mr. Hodel did not give my recommendation to hire new employees significant weight. Similarly, I did not have authority to promote employees or to independently formally discipline employees.

15. I also had no input into corporate policies or what the labor budget should be. I had no influence on the corporate directives that controlled my job. As a BM, all of my work was assigned to me through corporate directives or the Regional Manager. These directives controlled what tasks I worked on and how I performed those tasks.

**Auto-Chlor System, LLC**

16. It is my understanding that Auto-Chlor System, LLC, was one of my employers.

17. While my paycheck reflected "Auto-Chlor System of the Mid South, LLC," and that was the entity with which customers entered into contracts, I do not recall any other mention of this specific entity at any other time during my employment with Auto-

Chlor.

18. My offer letter reflected "Auto-Chlor System." My business card reflected "Auto-Chlor System." My email address was "sjohnson@autochlor.com." I believe that employees at corporate and employees at other branches used similar domain names (@autochlor.com) for their email addresses.

19. The employment handbook was for "Auto-Chlor System," which I believe was created at Auto-Chlor System, LLC's corporate office in Mountain View, California, and is the same employee handbook applicable to all Auto-Chlor branches throughout the country. This employee handbook includes policies and procedures that control the way all employees at Auto-Chlor branches across the country are to perform their jobs.

20. The vehicles I drove had the "Auto-Chlor System" logo on them. It is my understanding that all Auto-Chlor vehicles across the country have the same logo.

21. It is my understanding that all communications related to human resources run through Auto-Chlor System, LLC's main office in Mountain View, California. I also believe that corporate controlled the conditions of my employment as well as all other BMs across the country and had the ability to hire and fire us if they chose to do so. I believe this to be true because Gabriela Williams, from Auto-Chlor System, LLC's corporate office, conducted my exit interview. I also believe this because Chief Execute Officer, Ed Ivy and the Chief Operating Officer, Kevin McCurdy, of Auto-Chlor System, LLC, would tell me and other BMs exactly how they expected the branches to run at quarterly meetings.

22. Based on this, it is also my understanding that all employee records are maintained and controlled by the human resources department at the corporate office for Auto-Chlor System, LLC.

**Other BMs Like Me**

23. To my knowledge, Auto-Chlor paid all of its BMs the same way—meaning it classified all BMs, including myself, as exempt from overtime pay. I know this because I spoke with other BMs throughout the country about their employment experience and they complained about the fact that they worked significant overtime hours without

receiving overtime pay. For example, I recall going to a company-wide – meaning not limited to only BMs for Auto-Chlor System of the Mid South, LLC – Branch Manager training in Atlanta, Georgia, in 2019 with approximately 12-15 other BMs, including Gary Douglas (Memphis, Tennessee) and Sonny Cotton (Little Rock, Arkansas). During this training we discussed how many overtime hours we worked and how we were not paid overtime for those hours worked. In addition, I recall having similar conversations with other BMs, including Chris Richardson (Chicago, IL) and Dennis Gruenke (Madison, Wisconsin) during quarterly meetings in Chicago, Illinois.

24. To my knowledge, all BMs, including Gary Douglas (Memphis, Tennessee), Sonny Cotton (Little Rock, Arkansas), Chris Richardson (Chicago, IL), and Dennis Gruenke (Madison, Wisconsin), also primarily performed the same manual labor and customer service job functions as I performed. I believe this to be true because of conversations we had with each other and because we underwent the same training or they were required to attend the same quarterly meetings during which Auto-Chlor explained their expectation that a significant portion of our job would be to run route.

25. Like me, other BMs regularly worked more than 40 hours per week. I believe this to be true because of my conversations with other BMs such as Gary Douglas (Memphis, Tennessee), Sonny Cotton (Little Rock, Arkansas), Chris Richardson (Chicago, IL), and Dennis Gruenke (Madison, Wisconsin).

26. I believe that if all BMs were made aware of their right to receive overtime pay, and were provided assurances by the Court that Auto-Chlor and other employers could not retaliate against them for seeking their unpaid overtime wages from Auto-Chlor, other BMs, such as Gary Douglas (Memphis, Tennessee), Sonny Cotton (Little Rock, Arkansas), Chris Richardson (Chicago, IL), and Dennis Gruenke (Madison, Wisconsin), would likely come forward with claims for overtime compensation due. I believe this to be true because they had similar employment experiences as BMs as I did. Like me, these other BMs worked the same long hours I did and I anticipate would similarly want to recover any unpaid overtime due to them.

27. At no time do I recall that Auto-Chlor surveyed or studied the duties or work of myself or other BMs individually to determine whether the duties, work, or the position should have entitled BMs to overtime pay.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Sumner Johnson (Aug 2, 2023 14:56 CDT)

SUMNER JOHNSON

Declaration of Sumner Johnson - 3:23-cv-02555-AGT - 7