Edward J. Wynne (SBN 165819)
ewynne@wynnelawfirm.com
George Nemiroff (SBN 262058)
gnemiroff@wynnelawfirm.com
WYNNE LAW FIRM
80 E. Sir Francis Drake Blvd., Ste. 3G
Larkspur, CA 94939
Telephone   (415) 461-6400
Facsimile    (415) 461-3900

Logan A. Pardell* (admitted *pro hac vice*)
lpardell@pkglegal.com
PARDELL, KRUZYK & GIRIBALDO, PLLC
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Telephone (561) 447-8444
Facsimile (877) 453-8003

*Counsel for Plaintiffs and the Putative Collective*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mark  Sablowsky and Sumner Johnson, *on behalf of themselves and others similarly situated*,<br><br>                              Plaintiffs,<br><br>     vs.<br><br>Auto-Chlor System, LLC, Auto-Chlor System of New York City, Inc., and Auto-Chlor System of the Mid South, LLC<br><br>                         Defendants. | ) Case No. 3:23-cv-02555-AGT<br>)<br>)<br>) **DECLARATION OF MARCUS**<br>) **BROWN IN SUPPORT OF**<br>) **PLAINTIFFS' MOTION FOR**<br>) **CONDITIONAL CERTIFICATION**<br>)<br>)<br>)<br>)<br>)<br>) |

Declaration of Marcus Brown - 3:23-cv-02555-AGT - 1

I, Marcus Brown, declare under penalty of perjury as follows:

1.      I am over 18 years old.

**Employment History**

2.      I was employed as a Branch Manager ("BM") by Auto-Chlor System, LLC and Auto-Chlor System of the Mid South, LLC (collectively, "Auto-Chlor") from approximately December 2021 through September 2022 at an Auto-Chlor branch in Columbus, Ohio.

3.      As a BM, I was classified as a salaried employee and did not receive overtime compensation for any hours I worked over 40 in a week.

**Hours Worked**

4.      As a BM, due to the demands of the job, I typically was required to work much more than 40 hours in a week. I generally began working each workday between 7:00 a.m. and 7:30 a.m. because my Regional Manager, Joey Wilke, required that I arrive before any of the hourly staff to be prepared to participate in a daily recap, collect paperwork, and load trucks. Mr. Wilke knew I arrived this early because, nearly every morning, he either called me at this time or instructed me to call him once I arrived to the branch.

5.       I would often end my workday around 4:30 p.m. and 5:00 p.m. because Mr. Wilke required that I be present at the time that the last route driver completed his or her route. Mr. Wilke was aware of the route schedules and he communicated the mandate for me to be present when the last route driver came back to the branch and therefore was likely aware of when I left the branch.

6.      In addition, I rarely was able to take a meal break in which I was completely relieved of duty for 20 minutes or more. This is because, due to my packed schedule with running routes, I would eat on the road almost every day.

7.      Also, I was required to work "on call" approximately six to eight days per month while working as a BM. When working on call, I was typically expected to respond to any calls or emergencies immediately. I was unable to be anywhere other

than the branch or my home and I was unable to consume alcohol during this time. I was expected to be available for nearly all 24 hours of the days on which I was on call. While the route drivers were also required to be on call, I was on call more often because I believe the route drivers received overtime pay if they were on call and I did not. This would mean that it was much cheaper for me to be on call than a route driver.

8.     As a BM, I estimate that I worked a total of, on average, approximately 50 to 55 hours per week. On the weeks in which I was on call, I worked even more than this estimate. I believe Auto-Chlor knew about the long overtime hours that I worked because Mr. Wilke witnessed me working these hours and because I complained to both him and to Amy Garcia, a corporate Auto-Chlor human resources employee, about the long hours I was working.

**Job Duties**

9.     As a BM, I spent a vast majority of my day doing manual work and customer service job duties such as: servicing, installing, and/or rebuilding dishwashers, visiting with clients to collect payment and deliver supplies, counting inventory, and loading and unloading trucks. These are the same tasks that hourly paid route drivers were expected to perform. There were almost no tasks that I did that were not also performed by hourly paid employees. These duties were the most important part of my job as a BM.

10.     The reason so much of my job was in the field servicing dishwashers is because my branch was short-staffed. Auto-Chlor required that all clients be visited once every four weeks to collect payment, to check the dishwasher, and to deliver supplies. I recall that I visited with approximately 60 customers per month throughout the region. As such, a majority of my day was spent visiting these customers, and not performing management or sales-related functions.

11.     Although I held the BM title, I did not have authority to manage the branch. My assignments were provided by corporate and Mr. Wilke. I could not change corporate policy, set the prices, set the dress code, set the rate of pay for hourly

employees, or decide what products to sell.

12.    To the extent I performed any "managerial" job functions, it was rare and my involvement in such functions was minimal. For instance, I had minimal involvement in the hiring process. When I was asked to conduct initial interviews, I would only be expected to essentially pass information along about the candidate to Mr. Wilke who would conduct a "second" interview and make the hiring decision. He did not consider my recommendation when making these decisions because, when I did give him my opinion, he frequently disregarded it and did the opposite. In fact, midway through my employment as a BM, Mr. Wilke began to almost entirely handle the hiring process by conducting the initial interview and making the hiring decision himself. If he passed the candidate along to me for a second interview, it was only for the purpose of a "meet and greet" because he already made the decision to hire the employee if he requested that I meet them for a second interview. I know this because there were times I told Mr. Wilke that I did not like a particular candidate after I met them, and Mr. Wilke disregarded this opinion and hired the individual anyway. As such, I did not have the ability to make decisions with regards to hiring.

13.    This lack of authority also extended to discipline and terminations. These decisions were made by Mr. Wike and human recourses. To the extent I was involved, I merely carried out orders from Mr. Wilke or human recourses. I also did not have authority to promote employees.

14.    I had no input into corporate policies or what the labor budget should be. I had no influence on the corporate directives that controlled my job. As a BM, all of my work was assigned to me through corporate directives or the Regional Manager. These directives controlled what tasks I worked on and how I performed those tasks.

**Auto-Chlor System, LLC**

15.    It is my understanding that Auto-Chlor System, LLC, was one of my employers.

16.    While my paycheck reflected "Auto-Chlor System of the Mid South,

LLC," and this was the entity that was listed on contracts with customers, I do not recall any other mention of this specific entity at any other time during my employment with Auto-Chlor.

17.     My offer letter reflected "Auto-Chlor System." My business card reflected "Auto-Chlor System." My email address was mbrown@autochlor.com. It is my belief that employees at corporate and employees at other branches used similar domain names (@autochlor.com) for their email addresses.

18.     The employment handbook was for "Auto-Chlor System," which I believe was created at Auto-Chlor System, LLC's corporate office in Mountain View, California, and is the same employee handbook applicable to all Auto-Chlor branches throughout the country. This employee handbook includes policies and procedures that I assume control the way all employees at Auto-Chlor branches across the country are to perform their jobs.

19.     The vehicles other route drivers and I drove had the "Auto-Chlor System" logo on them. It is my understanding that all Auto-Chlor vehicles across the country have the same logo.

20.     All communications related to human resources run through Auto-Chlor System, LLC's main office in Mountain View, California. For example, new prospective employees apply via Auto-Chlor's website. It is my understanding that Auto-Chlor System, LLC controlled the conditions of my employment as well as all other BMs across the country and had the ability to hire and fire us if they chose to do so. It is also my understanding that all employee records are maintained and controlled by the human resources department at the corporate office for Auto-Chlor System, LLC. I believe this to be true because, when I had employment-related issues during my employment, including the number of hours Mr. Wilke expected me to work, I spoke about them with Amy Garcia, who was a human resources employee out of Auto-Chlor System, LLC's corporate office in Mountain View, California.

**Other BMs Like Me**

21.     To my knowledge, Auto-Chlor paid all of its BMs the same way—meaning it classified all BMs, including myself, as exempt from overtime pay. I know this because I spoke with another BM, Malachi (last name unknown), during a regional meeting in Indianapolis, Indiana, and we discussed how we were salaried and were not paid overtime for the overtime hours we worked.

22.     To my knowledge, all BMs, including Malachi (last name unknown), Jeremy Rowlett (Louisville, Kentucky) and Brad (last name unknown) (Cincinnati, Ohio), primarily performed the same manual labor and customer service job functions that I performed. I believe this to be true because we discussed over the phone or in person that much of our job consisted of running route.

23.     Like me, other BMs regularly worked more than 40 hours per week. I believe this to be true because I discussed the number of hours that I worked with Malachi (last name unknown), Jeremy Rowlett (Louisville, Kentucky) and Brad (last name unknown) (Cincinnati, Ohio), either in person or over the phone, and they voiced these same issues to me.

24.     I believe that if BMs were made aware of their right to receive overtime pay, and were provided assurances by the Court that Auto-Chlor and other employers could not retaliate against them for seeking their unpaid overtime wages from Auto-Chlor, other BMs, such as Malachi (last name unknown), Jeremy Rowlett (Louisville, Kentucky) and Brad (last name unknown) (Cincinnati, Ohio), would likely come forward with claims for overtime compensation due. I believe this to be true because of the fact that they similarly complained about the long hours that they worked and that they spent a large part of their day running routes. Like me, these other BMs worked the same long hours I did and I anticipate they would similarly want to recover any unpaid overtime due to them.

25.     At no time do I recall that Auto-Chlor surveyed or studied the duties or work of myself or other BMs individually to determine whether the duties, work, or the position should have entitled BMs to overtime pay.

1       I declare under penalty of perjury that the foregoing is true and correct to the

2  best of my knowledge and belief.

3

4

                                       Marcus Brown (Aug 2, 2023 15:42 EDT)

5                                  MARCUS BROWN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Marcus Brown - 3:23-cv-02555-AGT - 7